2015 AUG 10 AM 8:41
COURT OF APPEALS DIV I

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | No. 70762-1-I |
| v. | ) | |
| | ) | PUBLISHED IN PART OPINION |
| TOMAS SOLOMON AFEWORKI, | ) | |
| Appellant. | ) | FILED: August 10, 2015 |
| | ) | |

DWYER, J. — "'[T]he Sixth Amendment right to counsel, while fundamental, is not a right without limitation. Specifically, it is not a right subject to endless abuse by a defendant.'"[1]

Tomas Afeworki was charged with murder in the first degree. During pretrial proceedings, he experienced significant and ongoing conflict with each of his several attorneys. On the eve of trial, Afeworki repeatedly threatened his attorney, who was permitted to withdraw as a result. Afeworki was, thereafter, required to represent himself pro se. On appeal, Afeworki contends that this deprived him of his right to counsel.

After threatening his attorney, Afeworki was also required to wear a physical security restraint, not visible to observers, while in the courtroom. Afeworki now contends that this requirement violated his right to a fair trial.[2]

---

[1] Bailey v. Commonwealth, 38 Va. App. 794, 803, 568 S.E.2d 440 (2002) (alteration in original) (quoting McNair v. Commonwealth, 37 Va. App. 687, 695, 561 S.E.2d 26 (2002) (en banc)).

[2] In a lengthy statement of additional grounds for review, Afeworki asserts several additional claims. These are addressed and resolved in the unpublished sections of this opinion.

Finding no error in the trial court's supervision of the trial of this most difficult defendant, we affirm.

I

On October 26, 2010, Haylom Gebra and Michael Yohannes were walking along Pike Street in downtown Seattle when they saw an acquaintance, Afeworki, across the street. Yohannes lingered briefly, talking to Afeworki, and then caught up with Gebra at the intersection of Second and Pike. As Gebra and Yohannes waited for the light to change, Afeworki, who was holding a white towel, unexpectedly approached them from behind. Gebra heard a loud boom and watched as Yohannes fell to the ground. Afeworki immediately turned and headed north on Second Avenue toward Pine Street.

A number of people observed the shooting or its immediate aftermath, including Mohammed Dima, who was working as a uniformed downtown safety ambassador on the afternoon of the shooting. Dima heard the sound of a gunshot coming from the northwest corner of Second and Pike. From directly across the street, Dima saw a "body just drop" and saw a man standing there with "something white on his hand." The man then wrapped an object in "that white thing," placed the wrapped object in his pocket, and began walking north on Second Avenue. Dima described the man as a black man wearing a brownish "hoodie" and blue jeans with something brownish on the back pocket.

Alvaro Sotelo was working at Zaina Restaurant, located at 109 Pine Street, that afternoon. Sometime after he began his shift at 4:00 p.m., a man came in, ordered French fries, and asked to use the bathroom. When police

arrived a few minutes later, Sotelo told them about the customer in the bathroom, and the police directed that person to come out. After a few minutes, Afeworki emerged from the bathroom with his hands above his head saying, "I don't have a gun."

In a search of the bathroom, police found a 9 mm semiautomatic handgun that had been placed under the liner of the trash can. There were four cartridges in the magazine. In addition, police recovered three unfired cartridges from the toilet bowl. Forensic analysis later demonstrated that these unfired cartridges had been cycled through the handgun found in the trash can. Forensic analysis also revealed that the bullet recovered from Michael Yohannes's head was fired from that same 9mm handgun.

Three eyewitnesses were brought to a place near the scene of the shooting for a showup identification procedure. Two of the witnesses, Elijah Knight and Jean Marie Hayes, identified Afeworki as the shooter by his clothing. DNA recovered from the handgun found in the bathroom trash can provided further evidence that Afeworki was the shooter; comparing the partial DNA profile obtained from the gun to Afeworki's DNA profile resulted in a 1 in 120,000 chance that someone other than Afeworki was the source of the DNA on the gun.

An information charging Afeworki with murder in the first degree was filed on October 28, 2010.

On October 29, attorney Nicholas Marchi filed a notice of appearance on behalf of Afeworki. Five weeks later, on December 6, a notice of withdrawal and consent for substitution announced that attorney John Henry Browne was

substituting for Marchi. On January 31, 2011, Browne filed a notice of attorney's intent to withdraw. On February 7, attorney Anthony Savage Jr. filed a notice of appearance. Eight months later, on October 4, Savage was allowed to withdraw due to illness, and a hearing was set to confirm the appointment of counsel by the Office of Public Defense (OPD). On October 21, Marchi was back on the case as appointed counsel.

Afeworki soon began to overtly take an active role in his own defense, prevailing upon counsel to file his pro se "Motion to Dismiss for Violation of Due Process, [Due] to Prosecutorial Misconduct for Charging with Falsified Probable Cause."[3]

Not content to work through counsel, Afeworki followed this motion a few months later with letters sent directly to the trial court. In a letter to Chief Criminal Judge Ronald Kessler dated June 18, 2012, Afeworki wrote that he had "instructed my Attorney Nicholas Marchi to put in a motion to dismiss for violation of Due Process" on various grounds. He informed the court that if Marchi did not file his motion as directed, he would "feel like I don't have my Attorney's undivided loyalty and a conflict will arise because my constitutional rights are not protected." Afeworki followed this with an even more emphatic letter, dated July 10, 2012, complaining that his attorney had not filed "important pretrial motions on my behalf," and asking the court to appoint new counsel who would do as Afeworki wished.

---

[3] The motion was filed in March 2012 but was dated, apparently mistakenly, as March 2011.

Judge Kessler conducted a hearing on the matter on July 18, 2012. Marchi informed the court that Afeworki wanted to discharge him. Marchi joined in the motion, telling the court that "[o]ur positions on how the case should proceed have now limited us to not being able to communicate." Afeworki confirmed that Marchi was not doing the things that Afeworki wanted him to do, and that Afeworki wanted a "conflict-free attorney."

The court declined to find a conflict under the circumstances described. When Afeworki pressed the court on why his pro se motions had not been ruled on, Judge Kessler said that he ruled only on motions made by the attorneys. Afeworki responded, "Your Honor, then I would like to move pro se pursuant to Faretta v. California."[4] When Judge Kessler questioned whether Afeworki, in fact, wanted a new attorney, and tried to caution him on such a course, Afeworki responded unequivocally: "Maybe you didn't understand me. I am invoking my right to proceed pro se."

Judge Kessler accordingly began the pro se colloquy. He first asked Afeworki whether he had ever studied law, to which Afeworki replied, "I read law." He then asked if Afeworki had ever before represented himself in a criminal case, and Afeworki said that he had not. Judge Kessler next asked Afeworki if he understood that the charged crime carried a maximum penalty of life in prison and a $50,000 fine and that, if he were found guilty and the prosecutor proved that the current crime was his third strike, he would face life in prison with no possibility of parole. Afeworki responded that he understood.

---

[4] 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

The next part of the colloquy went less smoothly. When the court warned Afeworki that, should he be allowed to represent himself, he would be on his own and would not be afforded standby counsel, Afeworki expressed disbelief and displeasure. When Afeworki continued to argue with Judge Kessler rather than answer the court's questions, Judge Kessler found Afeworki's request to proceed pro se to be equivocal, and offered to contact OPD to appoint a new attorney for him. Afeworki, however, insisted that his request to proceed pro se was unequivocal, and that his right to self-representation was absolute and must be granted.

Judge Kessler then resumed the pro se colloquy, asking Afeworki once again whether he understood that he did not have a constitutional right to standby counsel and that, if he decided to give up his right to be represented by counsel, that decision would be final and he would not have the right to change his mind and later ask for an attorney. Afeworki responded, "I understand now."

When Judge Kessler asked Afeworki about his familiarity with the rules of evidence, Afeworki replied that he would learn them. The judge confirmed that Afeworki would have access to the evidence rules and additional legal resources through the Westlaw kiosk in the jail. Judge Kessler then underscored the importance of knowing the rules of evidence by offering an example.

> [I]f the prosecutor offers evidence against you, and that evidence is objectionable, and you fail to object for any reason, including the fact that you don't know about the rules of evidence, or why the objection should be taken, or what the objection is, that evidence will come in against you and you will not later be able to appeal that.

Making a similar point, Judge Kessler informed Afeworki that he would be treated like a lawyer—that is, he would have the "exact same" obligations as a lawyer.

Judge Kessler also informed Afeworki that he would have to seek trial preparation services, such as expert witness services, through OPD. Furthermore, he asked Afeworki whether he understood that, if he decided to testify in the case, the trial judge might require him to ask himself questions and then answer those questions, rather than permitting him to testify in narrative fashion. Afeworki said that he understood.

Judge Kessler then asked Afeworki whether anyone had threatened him or made any promises in order to convince him to give up his right to a lawyer. Afeworki responded, "No." Finally, the judge informed Afeworki that he did not have a right to a continuance of his trial date, but that he could ask for one if he desired.

Warning Afeworki that representing himself was a "serious mistake," the court tried one more time: "Since I am offering you the opportunity to have another lawyer, why don't you take that option and see what you think of that next lawyer before you decide to give up your right to a lawyer?" When Afeworki insisted, stating, "I am proceeding pro se," Judge Kessler replied, "You got it." Judge Kessler then found a knowing, voluntary, and intelligent waiver of the right to counsel, and granted Afeworki's request to proceed pro se.

The court nevertheless left Afeworki the option of being represented by counsel. The court set a hearing for one week later, requiring defense counsel to remain on the case until that time. The court told Afeworki that he could choose

at that hearing among three options: retain appointed counsel Marchi, have a different attorney appointed, or proceed pro se.

> On the 25th you can come here, tell me you still want to go pro se, you got it. Tell me you have decided you want to take my option -- my offer up and get a second lawyer, a different lawyer, you got it. You decide you want to keep Mr. Marchi, you got it.
> So you can have any of those three choices. You have got one week to make that decision.[5]

The parties returned to court on July 25. Afeworki proffered a motion to dismiss. Judge Kessler agreed to allow the motion to be filed. The court then asked Afeworki if he still wished to represent himself. Accusing the court of "intentionally impairing me and punishing me for exercising my rights" by refusing him standby counsel and access to law books, Afeworki withdrew his pro se status "[u]nder duress and under fear." The court agreed to direct OPD to appoint new counsel. On August 2, attorney James Bible filed a notice of appearance. Bible subsequently requested and obtained funding for another attorney, Anna Gigliotti, to assist him.

On April 11, 2013, the case was assigned for trial before the Honorable Laura Gene Middaugh. The trial court subsequently denied defense motions to suppress evidence brought pursuant to CrR 3.5 (confession procedure) and CrR

---

[5] Judge Kessler made clear that Afeworki was pro se in the interim until the hearing one week later.

THE COURT: He can change his mind.

. . . .

THE COURT: But as of this point, he is pro se.

We will give him a copy of [the order granting the defendant's motion to proceed pro se]. Mr. Afeworki will need to turn that over to the appropriate person in the jail so that he will have access to the pro se handbook and the -- and additional time for legal research.

The import of Judge Kessler's actions is clear from the record. Judge Kessler, after a full colloquy, ruled that Afeworki had affirmatively waived his right to be represented by counsel and invoked his right to proceed pro se. Then, in a proper exercise of the court's discretion, Judge Kessler allowed Afeworki one week in which to change his mind.

3.6 (suppression hearings).[6] Voir dire was then begun. However, on April 24, before a jury was empaneled, attorney Gigliotti informed the court of a medical emergency in attorney Bible's family. As a result, the trial court dismissed the potential jurors and recessed the trial until July 16, 2013.

Before trial could recommence, however, Afeworki brought yet another motion for a new attorney, which was heard on June 18, 2013.[7] At that hearing, Bible summed up the work that he had accomplished on the case since his appointment, but noted that he did not think there was any real possibility of pleasing Afeworki, who was alleging a conflict. Bible said that Afeworki understood that the likely alternative to Bible's representation was to represent himself. When the court invited Afeworki to speak, he detailed his dissatisfaction with Bible's representation. The court denied the motion for new counsel, pointing out that decisions as to trial strategy were for the lawyer to make.

---

[6] Immediately on the heels of these rulings, Afeworki demanded a new judge, claiming that Judge Middaugh was discriminatory and biased. In support of these contentions, Afeworki alleged that Judge Middaugh had deliberately placed a clock with a monkey on its face in the courtroom, intending to degrade and demean him because of his African heritage. The prosecutor pointed out that the court had replaced the nonfunctioning courtroom clock with one that had been in chambers; this clock had a "Paul Frank" logo monkey on its face. There had been no objection by anyone at the time of the clock's placement in the courtroom. The trial judge denied the request for a new judge.

[7] This was not the first time that Afeworki had expressed dissatisfaction with Bible's representation. He had commenced doing so several months before. In a letter to the court, dated December 16, 2012, Afeworki expressed his frustration that Bible would not file his pro se motions, writing, "I've asked my Attorney to turn in important pretrial motions, for the past 5 month[s] my attorney has not done as such." He then asked the court to appoint him "effective counsel that will file very important pre-trial motions . . . on my behalf." At subsequent proceedings, Afeworki continued to express dissatisfaction with Bible's unwillingness to file all of the pro se motions that Afeworki desired to be filed. For example, on April 22, 2013, Afeworki interjected the following: "For the record, I have asked my attorney to put in a motion to dismiss for violation of RPC 3.8 on the prosecutor's behalf. He has refused me, and I am just putting that on the record." The court responded by informing Afeworki that he could either have a lawyer or he could represent himself, but "you can't have it both ways." Nevertheless, just two days later, Afeworki continued to proffer his own motions to the court.

Afeworki responded by moving to proceed pro se "under Faretta v. California." He repeatedly insisted that this was his wish, and that his request was unequivocal. When the trial court explained that, should Afeworki proceed pro se, he would not be entitled to standby counsel or to a continuance of the trial date, Afeworki responded, "What I understand is I want to go pro se and everything that you're saying just sounds like a whole bunch of bullshit." Judge Middaugh ultimately referred the motion to Chief Criminal Judge Kessler for determination.

Three days later, at the hearing before Judge Kessler, Afeworki chose not to renew his motion to represent himself. According to Judge Kessler's "Order on Defendant's Reference to Self-Representation," Afeworki "referenced" self-representation, but refused to answer the court's questions on this topic, instead persisting in arguing his substantive pro se motions.

Consistent with his history of prevarication, one week later Afeworki prepared and signed a notarized motion and affidavit seeking to proceed pro se.[8] The case came on for trial for the second time on July 16, 2013. Afeworki changed tack yet again and reiterated his demand that the court dismiss Bible and appoint a new attorney to represent him. The court refused. Afeworki then said unequivocally, "I am proceeding pro se. I am going to represent myself." The court found this request untimely, as the trial date had arrived. Afeworki persisted: "You are denying my constitutional right to represent myself, let me get that right."

---

[8] The motion was not filed with the court until July 16, 2013, although Afeworki claimed that he had sent it to the court through the mail on the date on which it was notarized.

Soon thereafter, Bible informed the court that Afeworki had just said something to him to the effect that, "If you play with fire, you get burned." Bible found this comment "wholly inappropriate," and said that he was not sure what Afeworki meant by it. Afeworki responded, "It means exactly as it sounds." When pressed by the court, however, Afeworki tempered his words, claiming that he only meant that "[i]f there is any type of lawsuits, I am going to be suing his ass too."

The court cautioned Afeworki that he would not be allowed to "create a situation where this trial will not go forward, which is what I think that you are intending and trying to do." The court made the consequences clear:

> If you should say or do anything further in this case that makes [Bible] as an officer of the Court feel that he has to withdraw as your attorney, he can do so.
>
> . . . .
>
> If Mr. Bible says that he cannot continue because of what you say or do towards him and the associate counsel is unable to take over as counsel, you will be allowed to go pro se. But, you will step in at that moment with no additional prep time, nothing.

Bible told the court that he would find it difficult to meet with his client after the hearing that day in light of Afeworki's comment to him. Bible assured the court that he would meet with Afeworki the next morning to discuss voir dire.

By the next morning, however, Bible was asking to withdraw. He told the court that, as Afeworki was leaving the courtroom after the previous day's proceedings, he accused Bible of "shaking down" Afeworki's sister for money. Bible took this allegation very seriously, as his law firm had been appointed by OPD, and such a claim threatened his livelihood.

Bible also reiterated his concern about Afeworki's "play with fire" comment, which Bible took as a threat to his personal well-being. He pointed out that Afeworki did not limit this comment to a threat to sue Bible until after the court had intervened. Bible further reported that Afeworki had said that he knew Bible's younger sister.[9] Bible took this comment to be a threat as well. Bible believed that his continued representation of Afeworki would be in violation of the Rules of Professional Conduct.

The court asked Afeworki if he opposed Bible's request to withdraw. Afeworki said that he did not.[10] When the court said that Afeworki would be allowed to proceed pro se, his response again showed that he wanted to have it both ways: "I would like a different attorney. . . . I would like to renew all of my motions as a pro se defendant."

The trial court expressed its belief that Afeworki's persistently disruptive behavior was intended specifically to delay the trial. The court believed that Afeworki's earlier motion to proceed pro se, which he never renewed in front of Judge Kessler, was also intended to delay and disrupt the trial. The court believed that Afeworki had deliberately created a situation where Bible could no longer represent him, so that the court would give him a new attorney. The court refused to condone this behavior.

---

[9] It is not clear from either Bible's in-court statement or the trial court's findings of fact regarding Bible's request to withdraw whether this comment was made before or after the trial court's warning. See Finding of Fact 6 ("On 7/17/13 the defense attorney reported back to the court that Mr. Afeworki had also said something to the effect of 'I know where your sister lives' . . . .").

[10] All participants understood Bible's motion to withdraw to include the withdrawal of attorney Gigliotti as well. The record makes clear that she was appointed solely to assist Bible. The possibility of Gigliotti serving as Afeworki's sole counsel at trial was not considered to be a viable option.

I know that you have been advised on this in the past. I did say yesterday that I will certainly consider allowing you to proceed representing yourself, but I will not delay this trial so that you can do that. I told you that quite clearly yesterday, that if you continue the disruptive behavior and if you continue to make statements to Mr. James Bible that caused him to be unable to represent you, then the consequences of that would be that you would be representing yourself but there would be no delay in trial. You continue to make those statements.

Having decided to allow Bible to withdraw, the court conducted the pro se colloquy. As he had done before, Afeworki unequivocally expressed his desire to proceed pro se.

Now that I understand all of that, I am ready to proceed pro se. I am ready to represent myself. I feel like it is my US constitutional right. I am pretty sure it is under Washington State law too, where I could represent myself if I decide to represent myself.

. . . .

I am letting you know, we are going pro se.

The court decided to postpone a final ruling until the next day.

The next day, the trial court found that Afeworki had knowingly and voluntarily waived his right to counsel: "he understands the charges against him, the consequences, if he is found guilty under all of the scenarios that he has been proposed." The court added that this conclusion was supported by Afeworki's deliberate actions in creating a situation where appointed counsel was unable to continue to represent him.

In addition to that, I find that it is not just his request to go pro se that means that he [has] knowingly and voluntarily waived his right to counsel, but it is his actions in creating the situation where his third or fourth counsel is unable to continue to represent him because of Mr. Afeworki's actions. That, also, I find is a knowing and voluntary waiver of his rights to counsel.

The court concluded, "I am going to allow you to go pro se, sir."

By the time the parties next appeared in court—just four days later[11]—Afeworki had changed course yet again, telling the court that he did not want to proceed pro se, but wanted counsel. The court responded that he had waived the right to counsel by his actions. The court elaborated:

> I will say it now, I believe that your actions were done with the intent of having Mr. Bible withdraw so that you could get another attorney, when I had refused your motion.
> That I believe that you were trying to set it up so that you could be put in the position where I would have to give you another attorney. I explained to you that that is not going to happen.
> You made your decision to go pro se by acting towards Mr. Bible in such a fashion that he could not ethically continue to represent you. I made it clear to you that when you made your motion to go pro se, if you did that, you would have to go forward with trial.
> That is an irrevocable decision. It cannot be changed. You are now representing yourself. It was not a wise decision, I agree.
> We all tried to make it quite clear to you that you would be required to do these issues on your own and they were very complex. You are an intelligent person. You know or you knew the risks that were involved because they were explained to you quite clearly. You chose to take those actions. You cannot change them now. I will not give you another lawyer.

Afeworki insisted that he did not understand the proceedings. Noting that Afeworki's responses in the pro se colloquy were "quite coherent," and that he had already been through a complete colloquy once before with Judge Kessler, the court reiterated: "You can sit here and say that you don't understand it, what went on, but your actions last week prove to me that you did understand what went on."

Eventually deciding that it would not address the issue again, the trial court summarized the reasons for Afeworki's pro se status.

---

[11] July 18 was a Thursday. Consistent with King County Superior Court scheduling practices, the trial did not resume until July 22, the following Monday.

You made a motion to represent yourself on the eve of jury selection. I denied that as untimely. And then the next day I continued to inquire of you as to whether you wanted - really wanted to go pro se and if you understood the ramifications of that.

And then you made statements that I found - to your attorney - were threats. Your attorney made a considerable effort to try to keep on as your attorney and said that because of the threats and the statements you had made to him, he did not feel that he could ethically represent you, because he would not be able to do that.

And so I allowed him to withdraw, and you basically got your wish to go pro se. You have now changed your mind, and you don't want to go pro se. Perfectly understandable, because I think now you are beginning to understand exactly how difficult it is to represent yourself.

But the constitution does not allow you to, once you are representing yourself, once you have made that request and you begin representing yourself, to change your mind in the middle of trial, nor does the constitution allow you to take actions such that your attorney is required to withdraw because of your actions under ethical rules and then say that you are required to [have] a new attorney. I have made findings on the record that I believe that your actions have been intended to delay this trial, that your actions were intended to force Mr. Bible to withdraw because I denied your motion to grant you a new attorney, and I believe that your actions have been - I have made the findings, and I believe the record supports them, that it has been your intention all along to delay this trial, and you think that in some way you would force this Court to reconsider your motion and [to] give you a new attorney.

The court summed up the proceedings leading up to Afeworki's pro se status in written findings, concluding:

Based on all the actions of the defendant leading up to the withdrawal of his attorney, the Court found that Mr. Afeworki's actions were intentional; created a situation where his attorney had to withdraw and that Mr. Afeworki more likely than not thought that he would get appointed a new counsel, which request had previously been denied, and trial would further be delayed. Mr. Afeworki's actions constitute a knowing waiver of his right to counsel.

Finding of Fact 10.

- 15 -

The trial resumed with Afeworki proceeding pro se. The jury found him guilty of murder in the first degree as charged. He now appeals.

II

A defendant in a criminal prosecution has a right to the assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22 (amend. 10). Indigent defendants charged with felonies, or misdemeanors involving potential incarceration, are entitled to appointed counsel. McInturf v. Horton, 85 Wn.2d 704, 705-07, 538 P.2d 499 (1975); CrR 3.1(d)(1).

The right to counsel may be affirmatively waived, but such a waiver must be knowing, voluntary, and intelligent. City of Bellevue v. Acrey, 103 Wn.2d 203, 208-09, 691 P.2d 957 (1984). A valid waiver of the right to counsel requires that the defendant be made aware of the risks and disadvantages of self-representation, with an indication on the record that "'he knows what he is doing and his choice is made with eyes open.'" Acrey, 103 Wn.2d at 209 (quoting Faretta v. California, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)). "Preferably, there [will] be a colloquy on the record informing the defendant of the nature of the charge, the maximum penalty, and technical rules he must follow in presenting his case." City of Tacoma v. Bishop, 82 Wn. App. 850, 856, 920 P.2d 214 (1996) (citing Acrey, 103 Wn.2d at 211). "In the absence of a colloquy, the record must otherwise indicate that the defendant was aware of the risks of self-representation." Bishop, 82 Wn. App. at 856 (citing Acrey, 103 Wn.2d at 211).

"The Sixth Amendment, however, is not absolute. A defendant may lose his or her right to counsel through forfeiture or waiver [by conduct]."[12] United States v. Thomas, 357 F.3d 357, 362 (3d Cir. 2004); see also State v. DeWeese, 117 Wn.2d 369, 379, 816 P.2d 1 (1991) ("What the defendant cannot obtain because of a lack of a valid reason, that defendant should not be able to obtain through disruption of trial or a refusal to participate. *A defendant may not manipulate the right to counsel for the purpose of delaying and disrupting trial.*" (emphasis added)).

Our case law has recognized that United States v. Goldberg, 67 F.3d 1092 (3rd Cir.1995), "is instructive" in its explanation of the distinctions between the concepts of affirmative waiver, forfeiture, and waiver by conduct with regard to the right to counsel. Bishop, 82 Wn. App. at 857.[13] As explained above, "[a] waiver is an intentional and voluntary relinquishment of a known right. The most commonly understood method of 'waiving' a constitutional right is by an affirmative, verbal request." Goldberg, 67 F.3d at 1099 (citations omitted). Conversely, "[a]t the other end of the spectrum is . . . 'forfeiture.' Unlike waiver, which requires a knowing and intentional relinquishment of a known right, forfeiture results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right." Goldberg, 67 F.3d at 1100. "A court may find that a defendant has forfeited his or her right to counsel after having engaged in 'extremely dilatory

_____

[12] Waiver by conduct is also referred to as de facto waiver and implied waiver.
[13] The portion of Bishop that relies on Goldberg was cited with approval by our Supreme Court in City of Seattle v. Klein, 161 Wn.2d 554, 561 n.7, 166 P.3d 1149 (2007).

conduct' or 'extremely serious misconduct.'" Thomas, 357 F.3d at 362 (quoting Goldberg, 67 F.3d at 1101-02.)

In addition, a middle ground doctrine exists. This doctrine, waiver by conduct, is sometimes referred to as a "hybrid situation" because it combines elements of waiver and forfeiture. Goldberg, 67 F.3d at 1100. "Once a defendant has been warned that he will lose his attorney if he engages in dilatory tactics, any misconduct thereafter may be treated as an implied request to proceed pro se and, thus, as a waiver of the right to counsel." Goldberg, 67 F.3d at 1100. "[A] 'waiver by conduct' [can] be based on conduct less severe than that sufficient to warrant a forfeiture." Goldberg, 67 F.3d at 1101; accord Bishop, 82 Wn. App. at 859 ("'[W]aiver by conduct' requires that the defendant be warned about the consequences of his actions, including the risks of proceeding pro se, and can be based upon conduct less severe than that constituting forfeiture.").

The application of this doctrine is not limited to dilatory conduct. Other types of misconduct may also give rise to its application. See, e.g., Thomas, 357 F.3d at 362-65 (affirming trial court's finding that defendant had impliedly waived his right to counsel by threatening to harm and verbally abusing his attorney as well as by urging his attorney to engage in professional misconduct). "[T]o the extent that the defendant's actions are examined under the doctrine of 'waiver,' there can be no valid waiver of the Sixth Amendment right to counsel unless the defendant also receives Faretta warnings." Goldberg, 67 F.3d at 1100. However, the warning need only precede the conduct that eventually gives rise to the waiver. There is no requirement that it be timed (somehow) to directly—or

even closely—precede the relevant misconduct. Thomas, 357 F.3d at 363. As explained in one of the seminal cases discussing the issue,

> [the] suggestion that the District Court should have timed the [pro se] colloquy on the eve of counsel's motion to withdraw is a novel one unsupported by case law. The purpose of a [pro se] colloquy is to provide the defendant with notice that continued misconduct may result in the waiver of one's right to counsel; thus, we focus on whether [the defendant] was warned of the possible consequences, not whether the warning immediately preceded the District Court's order that the defendant must proceed pro se.

Thomas, 357 F.3d at 363 (citation omitted).

The State does not contend that this is a forfeiture case. This also is not an express or affirmative waiver case, despite the State's contention to the contrary. While it is true that Afeworki made numerous requests prior to trial to proceed pro se, in the end, it is apparent that Afeworki was required to represent himself as a result of his continued threats toward Bible. Indeed, Afeworki requested to proceed pro se on July 16, 2013. The trial court denied that request as untimely. That same day, Afeworki threatened Bible, causing the court to give Afeworki the above-quoted warning. Despite this warning, Afeworki again threatened Bible, who was permitted to withdraw as a result. According to the trial court's warning, at that point it was a foregone conclusion that Afeworki would be required to represent himself. It is true that, before concluding that "I am going to allow you to go pro se," the trial court engaged Afeworki in another pro se colloquy and that Afeworki once again expressed a desire to represent himself. However, by that time, Afeworki no longer had a choice in the matter. Given the context, any agreement Afeworki expressed with the court's inevitable order requiring him to proceed pro se cannot fairly be considered an affirmative

waiver.

Instead, this is a waiver by conduct case. The record establishes the following: Afeworki engaged in misconduct that caused the court to warn him that, if he engaged in further misconduct that caused his attorney to seek to withdraw, he would be required to proceed pro se. Afeworki nevertheless engaged in further misconduct. This misconduct caused his attorney to seek to withdraw. Afeworki supported the motion to withdraw and the court granted it. As a result, Afeworki was required to proceed pro se. Prior to the misconduct that gave rise to Afeworki's implied waiver of the right to counsel, he was warned of the risks and disadvantages of self-representation.

Afeworki's initial threat to Bible was the conduct that gave rise to the trial court's warning. In the midst of the July 16, 2013 hearing, Bible informed the court that Afeworki had just said something to him to the effect that, "If you play with fire, you get burned." Bible found this comment "wholly inappropriate" and perceived it as a threat to his personal well-being.

In response, the court cautioned Afeworki that he would not be allowed to "create a situation where this trial will not go forward, which is what I think that you are intending and trying to do." The court made the consequences of further misconduct clear by warning him as follows:

> If you should say or do anything further in this case that makes [Bible] as an officer of the Court feel that he has to withdraw as your attorney, he can do so.
> . . . .
> If Mr. Bible says that he cannot continue because of what you say or do towards him and the associate counsel is unable to take over as counsel, you will be allowed to go pro se. But, you will step in at that moment with no additional prep time, nothing.

- 20 -

Afeworki did not cease his misbehavior after the court's warning, thereby setting in motion the series of events that would lead to the trial court requiring him to proceed pro se. As they were leaving the very hearing at which Afeworki had been warned by the court, Afeworki accused Bible of "shak[ing] [Afeworki's] sister down" for money. Bible reported this to the court the next day and explained that, under the circumstances, he perceived this comment as a threat.

As a result of this further threat, Bible believed that his continued representation of Afeworki would be in violation of the Rules of Professional Conduct and sought permission from the court to withdraw. The court allowed Bible to withdraw. (Moreover, the associate counsel, Gigliotti, was unable to assume full or primary responsibility for the case and withdrew with Bible.)[14] Only then, in conformance with its earlier warning, did the trial court require Afeworki to proceed pro se.

Afeworki was well aware of the risks and disadvantages of self-representation before he committed the misconduct that followed the court's warning. Afeworki had previously brought a motion to proceed pro se in this very case. Indeed, Afeworki had requested to represent himself at a hearing on July 18, 2012. In response, Judge Kessler had engaged Afeworki in a lengthy pro se colloquy. As described above, Judge Kessler had asked Afeworki if he ever studied law or of he had ever represented himself in a criminal matter before. He had also asked Afeworki whether he understood that the charged crime carried a maximum penalty of life in prison and a $50,000 fine and that, if he were found

---

[14] Notably, on appeal, Afeworki does not assign error to the trial court's decision to permit Bible and Gigliotti to withdraw. This may be because the court asked Afeworki if he opposed Bible's request to withdraw, and he stated that he did not.

guilty and the prosecutor proved that the current crime was his third strike, he would face life in prison with no possibility of parole. Afeworki had replied that he understood. Moreover, Judge Kessler had asked Afeworki whether he understood that he did not have a constitutional right to standby counsel and that, if he decided to give up his right to proceed with counsel, that decision would be final and he would not have the right to later change his mind and ask for an attorney. Again, Afeworki had replied that he understood. Judge Kessler had then asked Afeworki about his familiarity with the rules of evidence and stressed the importance of understanding those rules in order to properly try the case and to preserve potential issues for appeal. Judge Kessler had emphasized that Afeworki would have the "exact same" obligations as a lawyer. Furthermore, Judge Kessler had informed Afeworki concerning how to seek trial preparation services, such as expert witness services. He had also informed Afeworki that, if he decided to testify in the case, he might be required to ask himself questions and then answer those questions, rather than testifying in a narrative fashion. Judge Kessler had confirmed that no one had threatened Afeworki or made him any promises in order to convince him to give up his right to counsel. Finally, Judge Kessler informed Afeworki that he was not entitled to a continuance of the trial date simply because he chose to proceed pro se.

After concluding the pro se colloquy, Judge Kessler had again offered Afeworki an alternative to the waiver of his right to counsel, stating, "Since I am offering you the opportunity to have another lawyer, why don't you take that option and see what you think of that next lawyer before you decide to give up

your right to a lawyer?" When Afeworki had insisted, stating, "I am proceeding pro se," Judge Kessler had found a knowing, voluntary, and intelligent waiver of the right to counsel, and granted Afeworki's request to proceed pro se. Even then, however, Judge Kessler had offered Afeworki alternatives to waiver. He had set a hearing for one week later and guaranteed Afeworki three choices at that hearing.

> [In one week] you can come here, tell me you still want to go pro se, you got it. Tell me you have decided you want to take my option -- my offer up and get a second lawyer, a different lawyer, you got it. You decide you want to keep Mr. Marchi you got it.
> So you can have any of those three choices. You have got one week to make that decision.

When the parties had returned to court one week later, Afeworki had withdrawn his request for pro se status and, as promised, Judge Kessler had directed OPD to appoint him new counsel. The record is thus clear that, prior to engaging in the repeated misconduct that resulted in Judge Middaugh determining that he had, by his conduct, impliedly waived his right to counsel, Afeworki had been clearly informed of the peril he faced and the risks and consequences of proceeding pro se.

The trial court herein was exceedingly fair to Afeworki. It took steps to safeguard Afeworki's rights, even as he was abusing those rights in an attempt to manipulate the trial process. Afeworki's choice to transgress the boundaries clearly established by the trial court by engaging in further misconduct after being warned by the trial court that he would be required to proceed pro se if he did so constituted an implied waiver (a waiver by conduct) of his right to counsel. The trial court did not err by so ruling.

III

Afeworki next contends that the trial court violated his right to due process. This is so, he asserts, because it required him to wear a Band-It restraint system throughout his trial. Afeworki's claim is unavailing.

"[A] defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances." State v. Finch, 137 Wn.2d 792, 842, 975 P.2d 967 (1999). "This is to ensure that the defendant receives a fair and impartial trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 3 and article I, section 22 (amendment 10) of the Washington State Constitution." Finch, 137 Wn.2d at 843. "[R]estraining a defendant during trial infringes upon this right to a fair trial for several reasons[:] . . . it violates a defendant's presumption of innocence[,] . . . . it restricts the defendant's ability to assist his counsel during trial, it interferes with the right to testify in one's own behalf, and it offends the dignity of the judicial process." Finch, 137 Wn.2d at 844-45. Given the constitutional implications of using restraints in a criminal trial, "shackles or other restraining devices should 'be used only when necessary to prevent injury to those in the courtroom, *to prevent disorderly conduct at trial*, or to prevent an escape.'" State v. Damon, 144 Wn.2d 686, 691, 25 P.3d 418, 33 P.3d 735 (2001) (emphasis added) (quoting State v. Hartzog, 96 Wn.2d 383, 398, 635 P.2d 694 (1981)).

Subject to this limitation, a trial court has broad discretion to determine which security measures are necessary to maintain decorum in the courtroom

- 24 -

and to protect the safety of its occupants. Damon, 144 Wn.2d at 691. A trial court may consider the following factors in determining whether the use of restraints is justified:

> "[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and the mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies."

Damon, 144 Wn.2d at 691 (alteration in original) (quoting Finch, 137 Wn.2d at 848). "[T]he trial court should allow the use of restraints only after conducting a hearing and entering findings into the record that are sufficient to justify the use of the restraints." Damon, 144 Wn.2d at 691-92.

"[A] trial court is required to exercise discretion in determining whether use of restraints is necessary to maintain decorum in the courtroom." Damon, 144 Wn.2d at 692. "[I]t is an abuse of discretion for the trial court to base its decision to use restraints solely upon concerns expressed by a correctional officer." Damon, 144 Wn.2d at 692.

A preliminary question invited by the circumstances of this case is whether the Band-It system implicates the same constitutional concerns as other physical restraints. A description of the Band-It system provides important context for this inquiry.

The device is essentially a taser contained in a band that is worn under a sleeve or pant leg. Unlike most restraints, which are either visible to jurors or

readily perceived by jurors, the Band-It is not visible when the wearer is clothed.[15] Also, unlike other restraints, the Band-It does not in any way directly constrain the wearer's movements. In fact, the Band-It can cause a wearer's movements to be constrained only when it is activated.

The design and functioning of the Band-It system address many of the constitutional concerns associated with other types of physical restraints. Because it is not visible to observers, it does not implicate the presumption of innocence. Moreover, because the Band-It does not physically constrain a defendant's movements, it does not implicate the defendant's right to the assistance of counsel (nor could it, in this case, in which Afeworki proceeded pro se at trial) or the defendant's right to testify. The sole remaining concern, described in the cases, is the possibility that the restraint might nevertheless interfere with a defendant's sense of autonomy and personal security, thus compromising the defendant's ability to participate in the trial. Additional precautions were taken herein to address this concern as well.

The jail's attorney assured the court that Afeworki would be informed every morning of what activities—for example, lunging at someone—would cause the Band-It to be activated. He would also be informed that mere rudeness or interrupting the court would not trigger this consequence.[16] Furthermore, for the duration of the trial, the trial court took the unusual step of

---

[15] It is not clear from the record where the band was placed on Afeworki.

[16] Indeed, the record bears out the truth of the representation made by the jail's attorney that mere rudeness would not cause the Band-It to be activated. While outfitted with the device, Afeworki persisted in his rude behavior toward the court, making statements such as "Bullshit. I don't want to hear nothing more you have to say," and "You're crazy. You lost your rabid-ass mind in this courtroom." Yet, the Band-It was never activated in the courtroom.

requiring *both* Afeworki *and* the prosecutor to remain seated at counsel table whenever jurors were present in the courtroom.[17] Thus, Afeworki was not singled out as being restrained from moving freely about the courtroom. Together, these additional steps minimized the possibility that Afeworki might inadvertently engage in conduct that would lead to the device being activated or otherwise be prejudiced by the existence of the security device.

Thus, as a general matter, the Band-It system posed fewer risks to Afeworki's constitutional rights than other types of physical restraints. Moreover, the specific orders of the trial court herein further minimized these risks by all but eliminating the possibility that the Band-It would be activated due to an inadvertent movement by Afeworki.[18]

The trial court's order is also supported by many of the considerations set forth above regarding whether the use of restraints in a specific case is justified. Afeworki was charged with an extremely serious offense—first degree murder with a firearm. Moreover, the State alleged that this conviction would constitute Afeworki's third strike. Accordingly, he was subject to either a high term-of-years sentence based on his high offender score or, if found to be a persistent offender, a life-without-parole sentence. As the attorney for the King County jail noted, Afeworki's status as a potential persistent offender left him with "nothing to

---

[17] Volunteer externs were used to ferry documents and exhibits back and forth in the courtroom during trial.

[18] There is no requirement that all of the constitutional concerns associated with physical restraints be eliminated. In fact, the United States Supreme Court has hypothesized that, in some cases, the use of extremely restrictive and highly visible restraints might be the best option in terms of both a defendant's constitutional rights and the need to maintain courtroom security. See Illinois v. Allen, 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) ("[I]n some situations which we need not attempt to foresee, binding and gagging might possibly be the fairest and most reasonable way to handle a defendant who acts as Allen did here.").

lose" should he attempt to escape or assault someone in the courtroom.

Moreover, Afeworki's unruly temperament was on display throughout the proceedings leading up to the trial court's decision to order use of the Band-It. He repeatedly spoke in a rude and aggressive manner to the court.[19] Also, the court was compelled on numerous occasions to reprimand him for interrupting the court and counsel. Furthermore, the trial court more than once threatened to have him removed from the courtroom because he was disrupting the proceedings. In fact, during a hearing on July 16, 2013, only two days before the court authorized use of the Band-It, the court was forced to recess the proceedings twice in an attempt to control Afeworki's disruptive behavior, and the number of jail personnel in the courtroom was doubled from two officers to four.

In addition to his verbally aggressive behavior toward the court, Afeworki had threatened his attorney.[20] Bible, who was well acquainted with his client and had heard the threat, "If you play with fire, you get burned," did not believe that it was limited to a threat to sue. Afeworki also made additional comments that Bible took to be threats not only to himself, but also to his younger sister.

Finally, as required, the court considered alternative security measures. For example, the court rejected the use of more restrictive physical restraints, including a belly chain, standard handcuffs, and soft hand restraints. Moreover, as noted, the court ordered other security measures that would work in concert with the Band-It, including requiring both Afeworki and the prosecutor to remain

___

[19] The following examples are representative of comments Afeworki made to the court: "I don't want to hear nothing from you, your Honor." "[E]verything that you're saying just sounds like a whole bunch of bullshit."

[20] The jail's attorney explicitly relied on this threat at the hearing as part of the basis for security concerns.

seated during all proceedings in front of the jury.[21]

The trial court herein was faced with the challenge of supervising the trial of an obstreperous defendant, charged with the most serious of crimes, who had demonstrated himself to be a threat to the safety of others. The court determined—based on input from the parties and jail personnel, as well as from drawing upon its own experience—that the use of some type of physical restraint was necessary to secure the courtroom and prevent Afeworki from engaging in dangerous misconduct. Thereafter, the court considered various types of physical restraints and ordered the use of the least restrictive, appropriate alternative. It also ordered additional security measures to complement the use of the physical restraint. The court thereby fashioned a comprehensive order that protected both Afeworki's constitutional rights and the safety of the people present in the courtroom for his trial. The trial court's decision was reasonable. There was no error. [22]

A majority of the panel having determined that only the forgoing portion of

---

[21] Additional considerations weighing in favor of the trial court's decision were Afeworki's age and physical attributes (he was in his late 20s, stood 5'10" tall, and weighed 190 pounds), his criminal history (which included several serious crimes), and evidence that he was a gang member.

[22] Afeworki also contends that the trial court erred by basing its decision to order use of the Band-It system solely upon concerns expressed by jail personnel. This is so, he asserts, because the trial court made an isolated statement that it accepted the assessment of Afeworki's "security risk level" presented by the jail's attorney. This contention is contrary to the record.

Before ordering the restraints discussed, the trial court participated in a lengthy, on-the-record discussion regarding whether and, if so, what security measures would be implemented. The court heard not only from the jail's attorney and corrections officers, but also from the prosecutor and Afeworki himself. The factors weighing in favor of the security measures ordered by the court (outlined above) were either explicitly mentioned at this hearing or were in the record before the court at that time. Moreover, the court explicitly relied on its own experience. For example, in response to Afeworki's insistence that he would not cause problems, the court stated: "I hardly have defendants, when this issue comes up who say, 'oh yes, I am going to jump up and attack.' It usually happens in a fit of anger."

The numerous factors supporting the use of the Band-It also belie Afeworki's present assertion that the trial court based its decision solely on Afeworki's pro se status.

this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

IV

In a statement of additional grounds for review, as allowed by RAP 10.10, Afeworki asserts the following additional claims.

Afeworki asserts an appearance of fairness claim, alleging judicial bias and racial discrimination.[23] "An appearance of fairness claim requires proof of actual or potential bias. Mere speculation is not enough. Furthermore, we presume a judge performs his or her duties without prejudice." State v. Harris, 123 Wn. App. 906, 914, 99 P.3d 902 (2004) (footnotes omitted), *abrogated on other grounds by* State v. Hughes, 154 Wn.2d 118, 110 P.3d 192 (2005). The

---

[23] Afeworki claims the following took place:
- "The trial court judge impedes on Mr. Afeworki's right to access of the court by concealing and attempting to conceal [the monkey clock] issues from reaching higher courts."
- "Trial court judge denies legal material, time to prepare witnesses and right to call witnesses, while allowing prosecution to call witnesses at will discriminating agaist [sic] Mr. Afeworki."
- "Interefer's [sic] in defense, allowing tampering of witness, causing intentional delays and giving impression she favored prosecutions [sic] case. Allows in tainted evidence."
- "Threatening Mr. Afeworki."
- "Minipulation [sic] of court hearings. Attempts to conceal motion. Interfering in Mr. Afeworki's access to jail law library and suspicious acts with Exhibit #19 (Box w/ Helwan are [sic] hand gun with magazine catridges [sic] and manila envelopes."
- "Depriving Mr. Afeworki of Information needed for defense. Misrepresenting facts of the case acting in concert with prosecutor to put on a show for the media in the court room."
- "Trial court judge did not consider facts in pretrial ruling just made ruling against Mr. Afeworki in order to deprive a fair trial."
- "Trial court judge stops Mr. Afeworki defense by excluding relevant information that go's [sic] to the heart of Mr. Afeworki's defense."

record that is properly before us[24] does not support Afeworki's allegations.

Accordingly, his claim fails.

Afeworki also asserts a claim of prosecutorial misconduct based on

allegedly improper argument.[25] "[T]he prosecuting attorney has wide latitude to

argue reasonable inferences from the evidence, including evidence respecting

---

[24] In making his arguments, Afeworki frequently relies on his own perception of tone of voice or facial expression. Because such things are outside the record on appeal, we will not consider them in deciding whether the trial court's actions ran afoul of the appearance of fairness doctrine. Afeworki also relies on statements that he claims were made, but that are not included in the transcript of trial court proceedings.

[25] Afeworki claims that the following took place:
- "Prosecutor makes statement to inflame the passion and prejudice of the jury. Tells jury it's thier [sic] obligation to find Mr. Afeworki guilty. Injects personal opinion of guilt."
- "Prosecutor draws to defendants [sic] exercise of privilege."
- "Prosecutor misrepresents witness testimony."
  - "Misrepresents witness Natalia's testimony."
  - "Prosecutor misrepresents Jean Marie Hayes [sic] testimony."
  - "Prosecutor misrepresents Mohammed Dima's testimony."
- "Prosecutor misrepresents Elijah Knights [sic] testimony."
- "Prosecutor misrepresents Detective Kasner's testimony."
- "Prosecutor violates rules of proffesional [sic] conduct: & violates title 18 USCA section 1001."
- "Constantly calling Mr. Afeworki killer, shooter: Injection of personal belief of guilt."
- "Prosecutor insinuates possession of personal knowledge of fact not offered in evidence and boasts cridibility [sic] of officer's [sic]."
  - "Prosecutor insinuates officer's [sic] 'may have' took pictures."
  - "Prosecutor insinuates finger prints on gun and consistant [sic] D.N.A. match."
  - "Prosecutor insinuates what missing evidence may posses [sic] and makes excuse for detective failure to investigate the case."
  - "Prosecutor makes excuses for officer's [sic] boasting thier [sic] credibility."
- "Prosecutor tells the jury to believe Mr. Afeworki then they have to believe: officers committed perjury."
- "Prosecutor confuses jury as to thier [sic] duty and burden of the state."
- "Insinuates Mr. Afeworki a liar & injects personal belief of guilt."
- "Prosecutor draws to his personal choice of homosexuality & family life to inflame jury's passion and prejudice."
- "Misrepresentation of facts and testimony [related to the collection of crime scene evidence]."
  - "Misrepresents Mr. Afeworki's testimony."
- "Vouchs [sic] for mystery stills to boast credibility of detective."
- "Prosecutor uses Hielum [sic] Gebra's false testimony knowingly and misrepresents the facts to jury to deprive Mr. Afeworki of a fair trial."
- "State acts in concert to produce falsified testimony with detective Steiger."

the credibility of witnesses." State v. Thorgerson, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). "[T]o establish prosecutorial misconduct, a defendant must prove that the prosecutor's conduct was improper and that it prejudiced his right to a fair trial." State v. Jackson, 150 Wn. App. 877, 882, 209 P.3d 553 (2009). "A defendant can establish prejudice only if there is a substantial likelihood that the misconduct affected the jury's verdict." Jackson, 150 Wn. App. at 883.

"If the defendant did not object at trial, the defendant is deemed to have waived any error, unless . . . the defendant show[s] that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012) (quoting Thorgerson, 172 Wn.2d at 455). "[R]emarks are not per se incurable simply because they touch upon a defendant's constitutional rights." Emery, 174 Wn.2d at 763; accord State v. Smith, 144 Wn.2d 665, 679, 30 P.3d 1245, 39 P.3d 294 (2001) ("Some improper prosecutorial remarks can touch on a constitutional right but still be curable."); see also State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008) (prosecutor's flagrantly improper comments in closing argument, undermining the presumption of innocence were cured by trial court giving a correct and thorough curative instruction on the reasonable doubt standard). Because Afeworki did not object at trial to the misconduct he alleges and any resulting prejudice could have been cured by a proper instruction to the jury, his claim fails.

Afeworki next asserts that the State committed multiple Brady violations.[26] In a criminal case, the prosecution must disclose to the defense any evidence that is favorable to the accused and material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). However, the failure to preserve "potentially useful" evidence is not a due process violation unless the defendant can show bad faith on the part of the State. State v. Wittenbarger, 124 Wn.2d 467, 477, 880 P.2d 517 (1994) (citing Arizona v. Youngblood, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)). Potentially useful evidence is "'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" State v. Groth, 163 Wn. App. 548, 557, 261 P.3d 183 (2011) (quoting Youngblood, 488 U.S. at 57). "'The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" Groth, 163 Wn. App. at 558 (quoting Youngblood, 488 U.S. at 56 n.*). Because he does not establish that the State either withheld any Brady material or improperly failed to preserve any potentially useful evidence, Afeworki's claim fails.

Afeworki next challenges various aspects of the certification for determination of probable cause. "[A]lthough a suspect who is presently

---

[26] Afeworki makes the following specific claims: the State provided him late and incomplete discovery; the State failed to maintain contact with every witness; the State failed to preserve certain evidence, including the white towel apparently used in the shooting and video from Zaina Restaurant; the State destroyed audio and video recordings from the car that transported Afeworki to jail; the State did not provide him a complete copy of the video from the interrogation room; and the State tampered with the in-car video that recorded his Miranda advisement.

detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." Gerstein v. Pugh, 420 U.S. 103, 119, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975). Thus, even if Afeworki were correct, he would not be entitled to relief on this claim.

Afeworki next asserts an ineffective assistance of counsel claim related to the representation of his third attorney, Anthony Savage Jr. To prevail on a claim of ineffective assistance of counsel the defendant must demonstrate that: (1) counsel's representation was deficient, meaning it fell below an objective standard of reasonableness based on consideration of all of the circumstances; and (2) the defendant was prejudiced, meaning there is a reasonable probability that the result of the proceeding would have been different but for the challenged conduct. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If we decide that either prong has not been met, we need not address the other prong. State v. Garcia, 57 Wn. App. 927, 932, 791 P.2d 244 (1990). Afeworki was represented by three additional attorneys after Mr. Savage was allowed to withdraw. Ultimately, Afeworki represented himself at trial. He does not establish prejudice arising from his claim against Mr. Savage. Therefore, his claim fails.[27]

---

[27] Denial of relief on this basis does not constitute a ruling from this court that Mr. Savage, in any way, failed to properly discharge his duties to his client.

Finally, Afeworki asserts that the State, through the police, tampered with witness testimony.[28] He concludes that his "right to confrontion [sic] has been violated." Afeworki's claim relies on asserted evidence outside the record, is speculative, and is not supported by considered argument. State v. Johnson, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) ("'naked castings into the constitutional sea are not sufficient to command judicial consideration'" (internal quotation marks omitted) (quoting In re Request of Rosier, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986))). Therefore, the claim of error fails.[29]

Affirmed.

We concur:

_____

---

[28] Specifically, Afeworki claims that Detective Steiger tampered with Gebra's testimony.
[29] In addition to his statement of additional grounds, Afeworki filed a brief entitled, "Appellant's Reply to: "State's Response to Defendant's Statement of Additional Grounds for Review RAP 10.2(D)". This court did not authorize this additional briefing and, therefore, we do not consider this pleading. See RAP 10.10(f).

No. 70762-1-I, State v. Tomas Solomon Afeworki

TRICKEY, J. (dissenting) — I respectfully dissent. Washington courts have adopted the doctrine of waiver of counsel by conduct set forth in United States v. Goldberg, 67 F.3d 1092, 1100-02 (3rd Cir. 1995). See City of Seattle v. Klein, 161 Wn.2d 554, 562, 166 P.3d 1149 (2007) (waiver of state constitutional right to appeal) (citing City of Tacoma v. Bishop, 82 Wn. App. 850, 859, 920 P.2d 214 (1996)). In concluding there was a waiver of counsel by conduct here, the majority outlines the difficulties the trial court faced with this criminal defendant when the case was pending on a charge of murder in the first degree while armed with a firearm. However, when the trial court permitted the defendant's appointed counsel to withdraw on the eve of trial, the trial court in my view had not adequately warned the defendant that his repeated misbehavior would lead to the waiver of counsel by conduct. Nor had the trial court sufficiently considered other alternatives instead of allowing counsel to withdraw. The defendant did not knowingly, intelligently, and voluntarily waive his right to counsel.

Here, the chief criminal judge conducted the first colloquy with the defendant on the risks and requirements of self-representation on July 18, 2012, almost one year before trial on July 16, 2013.[1] That colloquy, while thorough, did not include a specific discussion of potential consequences for the defendant if he attempted to delay or disrupt court proceedings.

---

[1] The trial had started on April 24, 2013, but had to be set over to July 16, 2013, due to a serious medical issue in defense counsel's family.

On June 18, 2013, the trial court engaged in the second colloquy with the defendant on self-representation at a pretrial hearing. The defendant consistently interrupted the proceedings and expressed his dissatisfaction with his attorney. Although the court instructed the defendant that he could not argue his own motions and should not be disruptive, the court did not warn the defendant that such behavior if it continued would result in the waiver of his right to counsel. Nor did the trial court advise the defendant that he would be risking other sanctions such as contempt or removal from the courtroom if he persisted in his conduct.

The trial court, concerned that the defendant's motion for self-representation expressed during the June 18, 2013 hearing was equivocal, referred the matter back to the chief criminal judge. On June 21, 2013, because the defendant would not respond to questions and insisted on arguing his own motions, the chief criminal judge found the request for self-representation to be equivocal and denied the motion.[2]

The defendant persisted in his argumentative behavior during the series of pretrial hearings on July 16-18, 2013. The trial court ruled on July 16, 2013 that the defendant's renewed request to represent himself was untimely. Yet the trial court allowed defense counsel to withdraw on July 18, 2013.

The court learned of the defendant's first threat to defense counsel during the July 16 hearing. In response, the court said to the defendant that "[i]f you should say or do anything further in this case that makes him as an officer of the

---

[2] The verbatim report of proceedings does not contain a transcript of the June 21, 2013 hearing, but the ruling is reflected in an order entered on July 16, 2013.

2

[c]ourt feel that he has to withdraw as your attorney, he can do so."[3] The court also said that the result would be the defendant would be "allowed to go pro se."[4]

In my view, the trial court's admonitions on July 16 and 17 were insufficient to adequately warn the defendant that he was in danger of permanently losing his right to counsel if he made more threats to his attorney. The trial court's warnings here were unlike the trial court's warnings in United States v. Thomas, 357 F.3d 357, 360 (3rd Cir. 2004), where the defendant there was explicitly told that "repetitive terminations of counsel . . . may be construed as a waiver of this [Sixth] Amendment right to counsel with the implications being then that you would have to represent yourself."

Nor did the trial court consider other alternatives to managing the defendant's misconduct such as contempt, removal from the courtroom, or restraints in the courtroom, as the State suggested.[5] See Illinois v. Allen, 397 U.S. 337, 343-44, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). "The manner of maintaining order in the courtroom is within the trial judge's discretion; the least severe remedy to accomplish the result is preferable." State v. DeWeese, 117 Wn.2d 369, 380, 816 P.2d 1 (1991).

Unfortunately, I have to conclude that the defendant did not knowingly waive his right to counsel by conduct. The "'deprivation of the right to counsel is so inconsistent with the right to a fair trial that it can never be treated as harmless

---

[3] Report of Proceeding (RP) (July 16, 2013) at 38.
[4] RP (July 16, 2013) at 38.
[5] The State objected to defense counsel's withdrawal and suggested the court consider other alternatives such as restraints on the defendant while in the courtroom. The restraints were imposed after defense counsel withdrew.

3

error.'" <u>State v. Silva</u>, 108 Wn. App. 536, 542, 31 P. 3d 729 (2001) (quoting <u>Frazier v. United States</u>, 18 F.3d 778, 782 (9th Cir. 1994) (citing <u>Chapman v. California</u>, 386 U.S. 18, 23 n.8, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). The conviction must be reversed and the case remanded for a new trial.

Trickey, J