# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Welfare of

E.G.B.,
DOB: 12/11/13,

DENA BISHOPP,

    Appellant,

    v.

DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,

    Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 77482-4-I

UNPUBLISHED OPINION

FILED: June 18, 2018

COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED
2018 JUN 18 AM 9: 18

DWYER, J. — Dena Bishopp appeals from the trial court's order of dependency. On appeal, Bishopp contends that the trial court erred by relying on hindsight to conclude that her three-year-old daughter, E.G.B., was dependent due to neglect. Bishopp also contends that the trial court erred by ordering her to sign broad releases of mental health information without adequately protecting her constitutional right to privacy. Finding no error, we affirm.

I

E.G.B. was born on December 11, 2013 to Dena Bishopp. E.G.B.'s father is unknown, although Bishopp believes that the father is Craig Gifford. Gifford

committed domestic violence against Bishopp while she was pregnant with E.G.B. and, as a result, Bishopp has a no-contact order against Gifford.[1]

In April 2016, Bishopp and E.G.B. moved into a 25-foot trailer on the property of Amber Wasisco. Amber[2] has two children who would often play together with E.G.B. around the property and at Amber's house. Amber's father, Lawrence Wasisco, lived in a separate trailer on the same property, approximately 10 feet away from Bishopp's trailer. Following an incident in which Lawrence reportedly pulled Bishopp out of his trailer by her hair, Bishopp obtained a no-contact order prohibiting Lawrence from coming within five feet of her. Following Lawrence's arrest, the relationship between Amber and Bishopp soured. Amber began to threaten to sue Bishopp unless she vacated the property.

On February 7, 2017, unbeknownst to Bishopp, E.G.B. left the trailer by herself. E.G.B. walked 150 to 200 yards through the snow and over a small bridge to Amber's house. E.G.B.'s passage to Amber's house was reportedly fraught with dangerous debris in the yard, including electrical cords. Bishopp began searching for E.G.B. roughly one hour after E.G.B. left the trailer. Bishopp found E.G.B. at Amber's house. Amber was washing E.G.B.'s clothes, so Bishopp left and returned later that evening to pick up E.G.B.[3]

---

[1] Gifford has never been involved in E.G.B.'s life and did not participate in the dependency hearing.

[2] Amber and Lawrence Wasisco are referred to by their given names for clarity.

[3] In the petition for dependency filed by the Department of Social and Health Services, the Department stated that it was reported that Amber brought E.G.B. "back to Ms. Bishopp and was concerned [Bishopp] could be dead." However, the petition also stated that Amber "reported that about 6:00 p.m., Ms. Bishopp arrived at her home frantically searching for" E.G.B. Cindy Palmer, the drafter of the petition, could not explain the discrepancy.

On February 8, 2017, Cindy Palmer, a social worker for the Department of Social and Health Services (the Department), responded to an emergency referral to check on E.G.B.'s welfare. Palmer interviewed Amber about the incident. Amber relayed her concerns to Palmer, including her belief that Bishopp used methamphetamine. Palmer observed that there were wooden boards, debris, tools, and "piles of dangerous items" strewn about the yard.

Palmer went to Bishopp's trailer and briefly spoke with her. Palmer was able to see inside of the trailer while she spoke with Bishopp. Palmer observed that the inside of the trailer was dirty with debris, cigarettes on the floor, and dried up food in a pan. Palmer spoke to Bishopp about the possibility of going to a shelter and submitting to a drug test that day. Bishopp explained that she could not go to a domestic violence shelter[4] and she refused to consent to a urinalysis.[5] Palmer attempted to discuss her concerns regarding E.G.B.'s living environment with Bishopp, but Bishopp told Palmer to leave. Palmer then contacted law enforcement.

Deputy Benjamin Wood responded to Palmer's request for assistance. It was roughly 28 degrees and snowing when Wood arrived at Bishopp's residence. Wood observed that there were numerous hazards around the trailer.

---

[4] Bishopp testified that she had previously stayed at the local domestic violence shelter but that her safety had been compromised. As a result, she was no longer eligible to stay at that shelter. Jessyca Murphy, a domestic violence advocacy and counseling provider, testified that "[w]hen the CPS case was opened [Bishopp] would not have been eligible to stay in our shelter." It does not appear that the Department made any effort to confirm that Bishopp was ineligible to stay at the proposed shelter or to find an alternative shelter.

[5] Palmer was alarmed by Amber's allegation that Bishopp was using methamphetamine. Palmer testified that, based on Bishopp's living environment, she believed that "it was a high probability . . . that those allegations could be true." Bishopp testified that she uses marijuana and alcohol infrequently but does not use any other controlled substances.

Wood confirmed that Bishopp's trailer had electricity and propane heating but did not have running water due to frozen pipes. Bishopp had tanks of water accessible as a backup. Wood observed that E.G.B. was dirty and noted that she was "dirtier than what I normally see even in similar conditions." Wood observed that the trailer itself was "filthy" and that there was a loose hammerhead laying on the floor as well as cigarette butts on a coffee table.

Wood asked Bishopp about the incident that had occurred the night before. Wood testified that Bishopp was dismissive of the incident, stating that E.G.B. goes over to Amber's house all the time. After observing the condition of the property, Wood believed that it would have been dangerous for a child as young as E.G.B. to traverse the property even without the particularly harsh winter weather. Based on the totality of the circumstances as he observed them, Wood placed E.G.B. in protective custody.

The Department filed a dependency petition, alleging that E.G.B. was dependent both because there was no parent, guardian, or custodian capable of caring for her and because she had been abused or neglected while in Bishopp's care. The petition noted that the Department had previously contacted Bishopp on several occasions for concerns similar in nature to the current allegations and that Bishopp had refused to speak to a social worker on three separate occasions.[6]

Bishopp's friends, husband Jason Joneli and wife Dawn Eldred, offered to let Bishopp and E.G.B. live in their home indefinitely. Joneli and Eldred

---

[6] Neither party has provided any further information concerning these past contacts.

submitted background check forms to the Department. A Department representative and E.G.B.'s guardian ad litem (GAL) visited the home. Jessica Keskey, social service specialist for the Department, testified that the Joneli and Eldred residence was not a barrier to reunification. However, the state of the residence was not the only concern of the Department. E.G.B. was placed into foster care.

E.G.B.'s foster mother reported that E.G.B. was not fully toilet trained and would make herself vomit when she was upset. E.G.B. did not speak much and would not respond to her own name when she was first removed from Bishopp's care. After a few months in foster care, the GAL reported that E.G.B.'s vocabulary had increased tremendously, that she was more vocal, and that she would respond to her own name.

In March 2017, E.G.B. was seen by a dentist, Dr. Sandra Pinzon. Dr. Pinzon discovered at least seven spots of tooth decay and recommended that E.G.B. undergo oral surgery. E.G.B. was referred to Dr. Edward Chin, who performed oral surgery on E.G.B. The surgery included six crowns, several root canals, and several fillings. Dr. Chin testified that E.G.B. would have been experiencing pain from the amount of decay that was present. Doctors Chin and Pinzon both testified that dental decay in children can generally be caused by a lack of dental hygiene, genetics, sleeping with a milk bottle for too long, or a combination of these factors. Dr. Chin testified that, had E.G.B.'s dental decay gone untreated, she would have been at risk for facial cellulitis and death.

Bishopp testified to her understanding that children did not need to see a dentist until they were three-years-old. Bishopp testified that E.G.B. did not appear to be experiencing any pain in her mouth and that she did not have trouble eating. Dr. Chin acknowledged that there are some practitioners who still follow an old standard that children do not need to see a dentist until they are three-years-old. However, Dr. Chin also testified that, throughout his 21 years of practice, the standard has been "first tooth, first visit."

Kelly Machnik, social services specialist for the Department, discussed the Department's concerns about Bishopp. The Department requested that Bishopp accept mental health services, a substance abuse evaluation with a urinalysis, and parenting education and support services. Bishopp attended regular mental health counseling with mental health therapist Donald Staal and obtained parenting services. However, Bishopp would not consent to a urinalysis.

Staal had been treating Bishopp since 2013. At her request, Staal conducted a mental health assessment of Bishopp and testified as her witness at trial. Staal diagnosed Bishopp with adjustment disorder based on mixed emotions, depression, and anxiety. Staal testified that Bishopp's high anxiety impaired her ability to safely and adequately care for E.G.B.[7] Staal recommended that Bishopp participate in 30 sessions of therapy to treat her condition. Staal also performed a chemical dependency assessment of Bishopp. Staal did not ask Bishopp to submit to a urinalysis and did not rely on any

_____

[7] Staal testified that Bishopp's high anxiety was caused, in part, by E.G.B.'s removal. Staal testified that physical custody of E.G.B. would "certainly help" with Bishopp's anxiety, but that it would likely not resolve the issue because Bishopp has not addressed some of the underlying causes of her anxiety.

urinalysis testing in formulating his assessment. Rather, Staal relied exclusively on his interviews with Bishopp and the information provided by the Department. Staal testified that, based on the information that he had received, he did not believe that Bishopp was addicted to or abusing any substance.

Following a five-day trial, the trial court found by clear, cogent, and convincing evidence that E.G.B. was neglected and that her physical and emotional health and safety were compromised to the point that she was at risk of harm. Accordingly, the trial court entered an order of dependency, concluding that E.G.B. was dependent with respect to her mother because of abuse or neglect and dependent with respect to her alleged father because of abandonment. Bishopp appeals.

II

Bishopp contends that substantial evidence does not support the trial court's finding that E.G.B. was neglected. This is so, she asserts, because the trial court erroneously relied on a hindsight analysis to establish a factual basis for neglect. We disagree.

We review a trial court's determination of dependency for substantial evidence. In re Welfare of Key, 119 Wn.2d 600, 613, 836 P.2d 200 (1992). Evidence is substantial where, viewed in the light most favorable to the prevailing party, a rational finder of fact could find the fact in question by a preponderance of the evidence. In re Dependency of M.P., 76 Wn. App. 87, 90-91, 882 P.2d 1180 (1994). Because the trial court is in the best position to hear testimony and

observe witnesses, we do not decide the credibility of witnesses or weigh the evidence. M.P., 76 Wn. App. at 91.

Before a court may declare a child dependent, it must find by a preponderance of the evidence that the child meets one of the statutory definitions of a "dependent child" set forth in RCW 13.34.030. Key, 119 Wn. 2d at 612. A "dependent child" is a child who (a) has been abandoned, (b) is abused or neglected, or (c) has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development. RCW 13.34.030(6).

"Abuse or neglect" is defined as "injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety, . . . or the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child." RCW 26.44.020(1). "Negligent treatment or maltreatment" is "an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety." RCW 26.44.020(16).

The trial court herein entered extensive and detailed findings of fact. The trial court's findings address the February 7 incident, E.G.B.'s living environment, E.G.B.'s health and development, and Bishopp's ability to provide adequate supervision and support to E.G.B.

The trial court found that E.G.B. first came to the attention of the Department after Amber reported that E.G.B. had left the trailer on her own and walked about 150 yards through accumulated snow to reach Amber's house. The trial court credited the testimony of Palmer, who "was startled by the unsanitary conditions she could see inside [the trailer], including items on the floor unsafe for a small child and a skillet of old and dried food," and who testified to the "strong offensive odor . . . present throughout the mobile home." The trial court also credited Wood's testimony that E.G.B.'s hair, face, and fingernails were dirty upon his arrival at the trailer, and his testimony that E.G.B. was "much less clean" than the children whom he normally sees. The trial court found that Palmer and her coworker "surveyed the exterior of the trailer and noted numerous items that posed safety threats to a small child wandering unsupervised including visible electrical cords, large items such as wood, as well as the general conditions outside which were treacherous and posed danger to a child w[a]ndering on their own."

Also concerning to the trial court was E.G.B.'s proximity to Lawrence, an individual who had already assaulted Bishopp once and against whom Bishopp had a no-contact order. The trial court found that the close proximity "exposes the child to the risk of domestic violence at any time" and "presents a risk of harm to the child." The trial court found that, regardless of the no-contact order, "it was possible for [Lawrence] to contact the mother, meaning there was risk of violence at any time. In fact, Ms. Bishopp testified that she thought one possible destination the child had gone on February 7, 2017 was [Lawrence's] residence."

The trial court found that E.G.B.'s dental health was "especially concerning to the court," noting that E.G.B. needed "6 crowns, multiple root canals and fillings, which on [a] 3 year old child, is extraordinar[ily] unusual." The trial court credited Dr. Chin's testimony that "surgery was needed to save the child's teeth and that the child would have been in some level of pain," and that the condition, "if it had remained untreated could have led to significant serious infection, and [affected] the child's facial muscles and caused possible death." The trial court noted that, although there could have been multiple causes for E.G.B.'s dental condition, "the most likely cause was lack of proper dental care and that if the child was seen during her 1st year, the [decay] could have been prevented."

The trial court recognized that Bishopp had testified to her belief that dental care was not necessary for children under three years of age. However, the trial court credited Dr. Chin's testimony that "in his 21 years of practice, the proper standard of care is a dental visit within the 1st year." Importantly, the trial court also found that "[w]hether Ms. Bishopp was aware of this or not ignores the responsibility of a parent to inquire whether that was in fact the standard and to get adequate care for their child."

Finally, the trial court noted that Bishopp "knows what is needed to safely and adequately parent her child," but that Bishopp had been uncooperative with the Department. The trial court found that Bishopp had "continued to refuse to submit to urinalysis and refused to participate in evaluations referred by the Department," that Bishopp's "use of marijuana is an unmitigated risk that needs

to be evaluated properly," that Bishopp "has apparent mental health issues . . . [and] needs parenting instruction to equip her with the skills to safely and adequately parent the child," and that Bishopp "cannot currently provide safe, stable, and sober housing in which the child could safely reside." The trial court found that, until "a demonstrated change in Ms. Bishopp's parental deficiencies and circumstances is shown, there remains a risk to her ability to safely parent her daughter."

The trial court found by clear, cogent, and convincing evidence that E.G.B. was neglected and that her physical and emotional health and safety were compromised to the point that she was at risk of harm. Accordingly, the trial court concluded that E.G.B. was a dependent child because of neglect.

Although Bishopp has assigned error to nearly every finding entered by the trial court, her briefing discuses only the court's findings concerning E.G.B.'s dental decay. Bishopp contends that those findings were based on an impermissible hindsight analysis. In support of this contention, Bishopp relies on our opinion in In re Dependency of Lee, 200 Wn. App. 414, 404 P.3d 575 (2017).

Lee concerned a child, Griffin, born with numerous and severe medical conditions that resulted in near-constant vomiting and profound weight loss. 200 Wn. App. at 419-20. Griffin's medical care providers believed that one possible solution to redress the weight loss and vomiting was the surgical insertion of a feeding tube. However, medical care providers agreed that it was "'not clear how much medically provided nutrition'" would improve Griffin's quality of life. Lee, 200 Wn. App. at 423. Griffin's parents were concerned that he would tear out a

feeding tube and, therefore, refused to consent to the procedure. Ultimately, two medical ethics consultations were held concerning the parents' refusal to consent to the insertion of a feeding tube. Each time it was concluded that deference to the parents' decision was appropriate and did not constitute a breach of medical ethical responsibilities. Lee, 200 Wn. App. at 424.

Griffin's health eventually declined and he nearly died from starvation. Griffin was placed into protective custody and medical care providers inserted a feeding tube without the consent of the parents. The feeding tube alleviated Griffin's vomiting and he was able to gain weight. Lee, 200 Wn. App. at 428. The Department filed a dependency petition and the trial court subsequently found that the parents' refusal to consent to the insertion of a feeding tube constituted abuse or neglect. The trial court employed a "logical inference" and a hindsight analysis, finding that, because Griffin gained weight following the insertion of the feeding tube, the refusal to consent to the procedure necessarily constituted abuse or neglect. Lee, 200 Wn. App. at 436-37.

On appeal, we rejected the trial court's use of a hindsight analysis.

Griffin . . . [has] numerous medical conditions that demonstrably affect his weight. Griffin's medical providers were unable to identify the exact cause of his vomiting and malnutrition and could not say with certainty, at any time prior to the institution of the dependency, that the use of a permanent feeding tube would ameliorate either of these issues. Although it is now clear that the use of a permanent feeding tube reduced Griffin's vomiting and allowed him to gain weight, this was not a situation in which a court could logically infer that Griffin's malnutrition was the result of an unsafe home environment. Moreover, the trial court's reliance on hindsight to conclude that rejection of the feeding tube constituted abuse or neglect was improper.

Lee, 200 Wn. App. at 438.

Unlike in Lee, the trial court herein did not rely on a hindsight analysis to find that E.G.B. was dependent because of neglect. E.G.B. had not seen a dentist since birth and, by the time that she was taken into protective custody, had dental decay so severe that extensive oral surgery was needed to prevent permanent damage and possible death. No medical care provider sanctioned Bishopp's decision to wait until E.G.B. was three-years-old before taking her to a dentist. Although Bishopp testified that she did not know that E.G.B. was in need of immediate dental care, the trial court credited Dr. Chin's testimony that E.G.B would have been in pain due to the severity of the decay and that the decay could have been prevented.[8]

E.G.B.'s dentists both testified that dental decay can be caused by a lack of dental hygiene, genetics, sleeping with a milk bottle for too long, or a combination of these factors. But regardless of the cause, it is clear that E.G.B.'s dental decay should have been treated much earlier. Unlike in Lee, where medical care providers could not say whether a feeding tube would alleviate the child's vomiting and weight loss, the remedy here was clear—E.G.B. needed to see a dentist.

In any event, although Bishopp frames the issue of dental decay as the sole or primary basis for the trial court's finding of neglect, the trial court entered

---

[8] Bishopp has not assigned error to the trial court's finding that E.G.B.'s dental decay, if left untreated, could have led to serious infection and death. Neither has Bishopp assigned error to the trial court's findings that the most likely cause of the decay was a lack of proper dental care and that the decay could have been prevented if E.G.B. had seen a dentist during her first year. Finally, Bishopp has not challenged the trial court's finding that whether she was aware of the proper standard of care "ignores the responsibility of a parent to inquire whether that was in fact the standard and to get adequate care for" E.G.B.

extensive and detailed findings concerning a litany of concerns. As discussed herein, the hazardous conditions inside and outside of the trailer in which E.G.B. resided, including E.G.B.'s proximity to an individual who had already once assaulted Bishopp, were significant concerns for the trial court. These concerns were highlighted on February 7, when E.G.B. wandered away from her mother's sight for an hour and navigated through the snow to her neighbor's house. It is the accumulation of the circumstances, as found by the trial court, that supports the ultimate finding of neglect.

Substantial evidence supports the trial court's findings and those findings, in turn, support the court's conclusion that E.G.B. is a dependent child because of neglect. There was no error.[9]

III

Bishopp next contends that the trial court violated her constitutional right to privacy by ordering her to sign releases of information as requested by the

---

[9] We note, however, that the Department's briefing improperly highlights Bishopp's poverty as a fact supporting dependency. The Department draws attention to various unfortunate—but not at all uncommon—aspects of E.G.B.'s life, but declines to provide meaningful context or analysis. For example, the Department repeatedly remarks on the skillet of dried food found inside of the trailer, E.G.B.'s dirty appearance, and the lack of running water. But frozen pipes in the middle of winter—especially in a trailer where the pipes are not well insulated—is not an uncommon occurrence. Fortunately, Bishopp had fresh water available in tanks, meaning that E.G.B.'s health and safety was not impacted by the lack of running water. That Bishopp did not use her reserve supply of water to wash dishes or bathe is not all that surprising and does not itself constitute a basis for dependency.

Over 200,000 children in Washington live below the federal poverty level. Domestic violence is a leading cause of homelessness for women and children. Washington Demographics of Poor Children, NATIONAL CENTER FOR CHILDREN IN POVERTY (June 11, 2018, 9:30 AM), http://www.nccp.org/profiles/WA_profile_7.html; Domestic Violence Housing First, The Intersection of Domestic Violence and Homelessness at 7-9, http://wscadv.org/wp-content/uploads/2015/05/IntersectionPaperDVHF.pdf. But poverty and exposure to domestic violence that is perpetrated against someone other than the child do not constitute negligent treatment or maltreatment under the law. RCW 26.44.020(16). The Department's focus on poverty and Bishopp's status as a domestic violence victim as a basis for dependency—independent of how those factors affect E.G.B.'s safety and welfare—is improper.

Department to facilitate the exchange of information. Bishopp asserts that the trial court's order allows the Department access to her mental health records, including psychotherapy notes.

Following the dependency hearing and dispositional argument, the Department prepared an order requiring Bishopp to "[s]ign releases of information as requested by the Department or GAL/CASA to facilitate exchange of information." The order also required:

> All court-ordered service providers shall make all records and all reports available to DSHS . . . . Parents shall sign releases of information and allow all court-ordered service providers to make all records available to DSHS and the guardian ad litem or attorney for the child. Such information shall be provided immediately upon request. All information, reports, records, etc., relating to the provision of, participation in, or parties' interaction with services ordered by the court or offered by DSHS may be subject to disclosure in open court unless specifically prohibited by state or federal law or regulation.

Bishopp filed 32 objections to the Department's proposed dependency order. However, Bishopp did not object to any of the language quoted above. To the contrary, she suggested that the trial court order that the releases of information be signed within 10 days.

> Add: Other: Service referrals shall be made within 5 days. The parties shall meet within 30 days [] to discuss the level of compliance with court ordered services. Releases of information shall be signed within 10 days so that at the meeting, the Department can identify what parents have done, how each parent is progressing in services, and what each parent is expected to do to reunify with [E.G.B.]. A first review shall be held within 60 days. At the first review, if background checks are complete for mother's roommates, and the residence is otherwise appropriate, and mother has complied with services, then in-home placement with mother shall be considered.

The trial court removed Bishopp's proposed requirement that service referrals be made within five days—instead requiring that referrals be made as soon as possible—and accepted the remainder of the proposed language.

On appeal, Bishopp contends that the broad language in the trial court's order allows the Department to access her psychotherapy notes. Such access, she avers, violates her constitutional right to privacy.

Bishopp's contention has several flaws. First, because this issue was never litigated, there are no facts in the record to indicate that the Department has or will ever request such information. Meaningful review is precluded when no facts have been established to which we can apply the law.

Second, by requesting that the trial court expedite the signing of releases, Bishopp invited the order of which she now complains. The invited error doctrine prohibits a party from setting up an error at trial and then complaining of it on appeal. City of Seattle v. Patu, 147 Wn.2d 717, 720, 58 P.3d 273 (2002). The litigant must take knowing and voluntary action to set up the error. In re Pers. Restraint of Call, 144 Wn.2d 315, 328, 28 P.3d 709 (2001). The invited error doctrine applies to purported errors of constitutional magnitude. State v. Heddrick, 166 Wn.2d 898, 909, 215 P.3d 201 (2009). Here, the invited error doctrine precludes Bishopp's challenge to the trial court's order.

Finally, as to the scope of the trial court's order, Bishopp forfeited any claim of error by failing to object to the proposed language. "'Unlike waiver, which requires a knowing and intentional relinquishment of a known right, forfeiture results in the loss of a right regardless of the defendant's knowledge

thereof and irrespective of whether the defendant intended to relinquish the right.'" State v. Afeworki, 189 Wn. App. 327, 345, 358 P.3d 1186 (2015) (quoting United States v. Goldberg, 67 F.3d 1092, 1100 (3rd Cir. 1995)), review denied, 184 Wn.2d 1036 (2016). By accepting the Department's proposed language and asking the trial court to require that all releases be signed within 10 days, Bishopp forfeited her objection to the scope of the trial court's order.

Bishopp has failed to establish a basis for appellate relief.

Affirmed.

We concur: